**BLACK BUTTE COAL COMPANY,**
Plaintiff,

v.

**UNITED STATES of America; Bruce Babbitt, Secretary of the Department of the Interior; Cynthia Quarterman, Director, Mineral Management Service, Department of the Interior, Defendants.**

No. 98–CV–22–B.

United States District Court,
D. Wyoming.

March 2, 1999.

Joseph E. Jones, Fraser Stryker Vaughn Meusey Olson Boyer & Bloch, Omaha, NE, Bruce A. Salzburg, Herschler Freudenthal Salzburg Bonds & Zerga, Cheyenne, WY, for Plaintiff.

Nicholas Vassallo, Assistant U.S. Attorney, District of Wyoming, Cheyenne, WY, Ann D. Navaro, Department of Justice, Washington, D.C., for Defendants.

## ORDER REVERSING ADMINISTRATIVE DECISION

BRIMMER, District Judge.

This review of agency action brings about a unique circumstance. At issue is whether the Mineral Management Service ("MMS") properly assessed royalties under a federal coal lease on "deferral payments." Black Butte and Idaho Power had entered into a contract where Black Butte would supply Idaho Power coal for its new power plant. However, Idaho Power was not able to accept the coal for the time it was scheduled to be delivered. Idaho Power then paid Black Butte deferral payments as reimbursement for idle mine expenses incurred as a result of Idaho Power not taking delivery of the coal. The deferral payments were specifically designed to not affect the underlying coal contracts. Black Butte eventually delivered coal to Idaho Power and the deferral payments were never credited against the coal bought.

In spite of this, MMS, and eventually the Department of Interior ("DOI"), ruled that the deferral payments were part of the "gross proceeds" received for the production and disposition of coal (as defined under their regulations) and thus were subject to the royalty provision in the federal coal leases.

The plaintiff vehemently argues on appeal that substantial evidence does not support finding that the deferral payments were in any way related to the production or disposition of coal. Thus, the plaintiff reasons, the deferral payments could not be part of the gross proceeds received for coal production. The Court, being fully advised of the premises, **FINDS** and **ORDERS:**

### Factual Background

The material facts of this case are not in dispute. Black Butte operates a surface coal mine near Point of Rocks, Wyoming. Black Butte and the United States are parties to two coal leases that cover the Point of Rocks mine, W–6266 and W–23411.

### A. The Federal Coal Leases

Lease W–6266 was originally issued to Rosebud Coal Sales Company by the Department of Interior ("DOI") in 1976.

This lease was subsequently assigned to Black Butte. This lease was not a standard federal coal lease, but rather was a unique lease negotiated by Rosebud and the United States. The lease contained the following provisions which relate to Black Butte's obligation to pay production royalties to the United States.

> Sec. 5. *Production Royalty.* (a) A production royalty shall be due on Coal extracted by the Lessee from the Lease Lands.
>
> .     .     .     .     .
>
> (2) The production royalty for Coal produced by underground mining methods shall be 8 percent of the gross value of the Coal produced but not less than:
>
> .     .     .     .     .
>
> (b) the Lessee agrees that the Lessor shall determine the gross value of the Coal produced from the Leased Lands for the purposes of Subsection 5(a) as follows:
>
> (1) The *gross value* shall be considered to be the price received by the Lessee, adjusted for transportation and/or processing costs so that it is a measure of the value of the Coal at the mine mouth (or in the case of strip mining that point where the Coal is delivered from the pit). . . .

The lease also stated that it was "subject to the terms and provisions of the act of February 25, 1920 . . . and to all regulations . . . of the Secretary of the Interior now or hereafter in force which are made part hereof."

In 1983, Rosebud and the United States entered into Lease W–23411. This lease was assigned to Black Butte. "This lease [was] subject to all regulations of the Secretary of the Interior . . . which are now in force or (except as expressly limited herein) hereafter in force, and all such regulations are made part hereof." Section 6 covered production royalties.

> The lessee shall pay a production royalty of 12.5 percent of the value of coal produced by strip or auger methods and

8 percent of the value of coal produced by underground mining methods. *The value of coal shall be determined as set forth in 30 CFR 211.* Production royalties paid for a calender month shall be reduced by the amount of any advance royalties paid under this lease to the extent that such advance royalties have not been used to reduce production royalties in a previous month. . . . Production royalties shall be payable the final day of the month succeeding the calender month in which the coal is sold, unless otherwise specified in 30 CFR 211. The royalty rates provided in this section shall not be subject to revision except in the course of lease readjustment.

## B. The Idaho Power Company Contract

Idaho Power Company and Black Butte entered into a long term contract on January 1, 1974. Per this contract, Black Butte would supply coal to Idaho Power for a new power plant. The contract obligated Idaho Power to purchase large amounts of coal in 1980, 1981, and in the years 1984–1987.

In 1976, Commonwealth Edison Company and Idaho Power entered into an option agreement which provided that Commonwealth Edison would purchase from Idaho Power all of the coal Idaho Power was obligated to purchase from Black Butte. In an amendment to this option, Idaho Power excluded a total of 3.3 million tons from this option agreement for its own use. Thus, Idaho Power was still obligated to purchase 3.3 million tons of coal from Black Butte.

## C. 1981 Deferral Agreement

In 1981, Idaho Power and Black Butte entered into a deferral agreement. This agreement covered a period not to exceed four years. The deferral payments were based upon a percentage of the coal price Idaho Power would have been otherwise

obligated to purchase under the 1974 contract. However, the 1981 agreement expressly stated that the purpose of the deferral payments was to "reimburse Black Butte for expenses incurred due to idle capacity at the mine resulting from Idaho Power" not taking delivery of coal. The deferral contract did not change any conditions of the 1974 contract. Idaho Power remained obligated to pay the full 1974 contract price for the coal; that is, the parties specifically agreed that the deferral payments could not be credited against the price of the coal when delivered.

### D. 1984 Deferral Agreement

Idaho Power was unable to take delivery of the coal within the deferral period. As a result, in 1984, the parties entered into a deferral agreement that deferred delivery of the coal until May 1985. In exchange for the deferral, Idaho Power agreed to pay a deferral charge equal to 15% of the per ton price of coal for each ton deferred. Idaho Power remained obligated to pay the full contract price for the coal. The parties also specifically agreed that the deferral payments were not to be credited against the contract price.

From 1981 to 1985, Idaho Power paid Black Butte deferral payments totaling $13,432,932.77. No payments were made after November 12, 1985. No coal was ever delivered under the 1974 contract. The 1974 contract was ultimately terminated pursuant to an agreement on June 19, 1986.

### E. Sierra Pacific Contract

On June 19, 1986, Idaho Power, Sierra Pacific, and Black Butte entered into a coal purchase contract. This contract obligated Idaho Power to purchase 3.2 million tons of coal from 1986 through 1992. The price of the coal under the 1986 contract was not reduced for the deferral payments previously made.

### *Procedural History*

### A. The Initial Determination

On March 19, 1993, the Mineral Management Service ("MMS") assessed Black Butte royalties on the deferral payments made by Idaho Power. These royalties were due in connection with the two federal coal leases described above. MMS initially found that "[t]he deferral payments received by Black Butte [were] associated with the 3.2 million tons of produced coal but were not included in the royalty value on which Black Butte made royalty payments." MMS stated that the failure to include these royalty payments in their assessment resulted in underpaying the federal government by $155,452.44. The payments due now total $612,314.09, plus interest.

### B. Mineral Management Services Appeal Decision

MMS framed the issue as follows: Whether the payments to Black Butte for deferred delivery of coal should be included in the royalty bearing gross proceeds received for coal produced from federal leases.

Black Butte argued that the deferral payments were not royalty bearing because they were not part of the value of the coal, that the payments were separate from the price received by Black Butte under lease W–6266. Specifically, Black Butte argued that the non-standard royalty provision in lease W–6266—"gross value shall be considered to be price received by the Lessee"—was more restrictive than the "gross proceeds" concept used in the applicable valuation regulations. However, MMS determined that both leases were subject to the applicable valuation regulations and dismissed that argument. MMS reasoned that royalties were due not just on the price paid for the coal, but on all consideration paid for the coal, and that this included the deferral payments.

The coal valuation regulations in effect prior to March 1, 1989, 30 C.F.R.

§ 203.250(g) and 43 C.F.R. § 3485.2(g), stated that royalties would be assessed on the "gross value." Gross value was defined as the sale or contract price unless MMS determined that the sale or contract is not a bona fide transaction between independent parties because it is based upon consideration in whole or in part upon considerations other than the value of the coal. MMS looked to that "gross value" standard and subsequent legislative history implementing the current "gross proceeds" standard, and found that "gross value" had always been interpreted to mean the same thing as the current term, "gross proceeds." The legislative history relied upon is set forth in the next paragraph.

The gross proceeds standard was made effective March 1, 1989 (set forth in 30 C.F.R. § 206.257) and states that with exceptions, the value of coal that is sold in an arm's length transaction shall be the gross proceeds accruing to the lessee. The term gross proceeds is defined as follows:

> Gross proceeds (for royalty payment purposes) means the total monies and other consideration accruing to a coal lessee for the production and disposition of the coal produced....

MMS found that it had made clear in the notice of proposed rulemaking that the definition of gross proceeds was intended to be expansive to ensure that it included all the benefits flowing from the purchaser to the seller for the disposition of coal. MMS also found that it had made clear that although the term "gross proceeds" was not used in earlier regulations:

> The regulations in effect since 1976 have required royalty to be based on gross value. Although the gross proceeds term herein is new, it is not forwarding a new concept. The selection of the term 'gross proceeds' is to assure regulatory consistency within MMS and is an exercise of discretion provided by statute.

54 Fed.Reg. 1492, 1505 (Jan. 13, 1989). Thus, the agency reasoned, gross value and gross proceeds were actually the same concept. Gross proceeds could then be used in interpreting Black Butte's leases.

Black Butte argued that the rationale set forth in *Diamond Shamrock Exploration Company v. Hodel* required MMS to not assess royalties on the deferral payments. 853 F.2d 1159 (5th Cir.1988). Black Butte argued that under the principles announced in *Diamond Shamrock,* royalties are not due on payments that were not related to the ultimate disposition of mineral resources. Thus, because Black Butte's deferral payments were expressly for the purpose of reimbursing Black Butte for idle mine time and not for the production of coal, royalties could not be assessed on those payments. MMS found that the payments involved here were different than those involved in take-or-pay clauses because here Black Butte was not required to take a given quantity of coal or pay for it in full even if it did not buy the coal. That is, unlike the take-or-pay payments in *Diamond Shamrock* (which were payments not to produce gas), MMS found that Black Butte's payments were to defer production and keep that contract in place to ensure a continuing source of coal; thus, there was a clear connection between the deferral charges (paid to postpone delivery) and the particular coal produced and sold under the leases. In sum, MMS reasoned that Black Butte's payments were not paid in lieu of production, they were paid to delay production.

## B. I.B.L.A. Appeal Decision

Judge Arness of the Interior Board of Land Management Appeals determined that another purpose of the deferral agreements was to continue the contract to purchase coal so that Idaho Power would pay the full, escalated price when that coal was actually delivered. *See* 141 I.B.L.A. 190, 191 (1997).

Judge Arness found that the take-or-pay provisions of the *Diamond Shamrock* case provided little guidance because "they

ar[o]se from complex contract relationships between gas producers and the pipelines they use for gas sales and distribution that find little in common with this coal transaction." *Id.* at 192. But he found that *Diamond Shamrock* and its progeny do establish that royalty collection depends on a link between lease production and money paid to a coal lessee. *See id.*

Judge Arness also found that the contention "there was no connection between the deferral payments and coal production" did not bear scrutiny. The 1981 deferral agreement stated that in consideration of the payments to be made "all referenced agreements shall remain in full force and effect." *See id.* at 193. The deferral payments did not reduce the amount due under the coal sale agreement. *See id.* The delivery of coal was ultimately obtained, and the purpose of the 1974

coal sale agreement was to obtain an dependable source of coal. *See id.*

Judge Arness viewed the 1981 and 1984 deferral agreements as extensions on the option to buy coal—they were an extension of time on an earlier option to buy coal that contemplated delivery of the coal at a certain time. *See id.* Thus, the take-or-pay provisions were not analogous because Idaho Power did not pay for a "failure to purchase," but instead paid security for the future delivery of coal. Therefore, the disputed payments were directly related to coal production.[1]

### *Analysis* [2]

### I. Standard of Review

█ Black Butte seeks judicial review of final agency action under the Administrative Procedure Act, 5 U.S.C. § 702 et seq. (1994). This is the source of the Court's jurisdiction. When reviewing agency ac-

---

1. Judge Arness also noted that although the parties labeled their payments "deferral charges," the agency must look to the substance of the agreement when determining whether a royalty should be issued, and is not bound by the parties' characterization of the payments.

2. As a prefatory matter, the Court finds that the agency correctly found that both of the federal coal leases were subject to the "gross proceeds" standard. DOI, through MMS, issues and administers coal leases for federal lands under the Mineral Lands Leasing Act, 30 U.S.C. §§ 181–287 (1994). Under this Act, coal lessees must pay royalties calculated as a specified percentage of "the value of coal as defined by regulation." 30 U.S.C. § 207(a) (1994). Until the royalty valuation regulations were revised prospectively in 1989, the regulations stated that the royalties were due on the "gross value" of the coal. *See* 30 C.F.R. § 203.250(g) (1988)(1982); 43 C.F.R. § 3485.2(g). Both leases contain this "gross value" term.

   In the 1989 regulations, currently in effect, the value of coal for royalty purposes is defined as "the gross proceeds accruing to the lessee . . . ." 30 C.F.R. § 206.257(b)(1) (1998). Gross proceeds means "the total monies and other compensation accruing to a coal lessee for the production and disposition of the coal produced." 30 C.F.R. § 206.251 (1998). In the preamble to the 1989 regulations, DOI stated that "[a]lthough the gross proceeds

term herein is new, it is not forwarding a new concept." "The selection of the term 'gross proceeds' [as opposed to gross value] is to assure regulatory consistency within MMS and is an exercise of discretion provided by the statute." 54 Fed.Reg. 1492, 1505 (Jan. 13, 1989). The preamble also states that "[t]he MMS always has had a consistent policy that royalty is due on no less than the lessee's gross proceeds, which includes all payments for production." *Id.* at 1513.

   From this language, it is evident that the previous term, "gross value," was identical to the new term, "gross proceeds." DOI simply changed the term to "gross proceeds" to be consistent with other regulations. Given this, when comparing the definition of "gross proceeds" with the "gross value" definition used in lease W–6266, one sees that the terms are substantially identical.

   Finally, the leases contained clauses stating that they were subject to regulations now or hereafter in effect. Thus, even if "gross value" and "gross proceeds" were not identical, which they are, the leases would nevertheless be subject to the "gross proceeds" standard.

   Accordingly, the remainder of this opinion will address whether the agency correctly determined that Black Butte's deferral payments were part of the gross proceeds such that they were subject to royalties under the federal coal leases in question.

tion under the APA, a court must first address the standard of review. In this case neither party has agreed as to the proper standard of review. The standard of review can be quite a complex matter at times, and as the Court will explain, the standard of review has substantial implications as to the level of deference this Court must accord to the agency in this case.

■ The Tenth Circuit recently conducted a thorough review of the APA's standards of review in *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1572–75 (10th Cir.1994). A review of the principles discussed in that opinion is especially appropriate in this case. Judicial review of both formal and informal agency action is governed by § 706 of the APA. That statute provides that "a reviewing court shall ... hold unlawful and set aside agency action, findings, and conclusions found" not to meet six distinct standards. *Overton Park v. Volpe*, 401 U.S. 402, 413, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *Olenhouse*, 42 F.3d at 1573 (citing 5 U.S.C. § 706(2)). Informal agency action must be set aside if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Overton Park*, 401 U.S. at 413–14, 91 S.Ct. 814. While an agency's action is entitled to a presumption of regularity, "that presumption is not to shield [the agency's] action from a thorough, probing, in-depth review." *Id.* at 414, 91 S.Ct. 814.

■ Both parties agree that this Court is reviewing informal agency action. Recall that the agency action at issue involves MMS's assessment of royalties under federal coal leases. Such an order does not fit within any definition of formal agency action under the APA. Accordingly, the "arbitrary or capricious" standard is applicable. *See Olenhouse*, 42 F.3d at 1574. "The duty of a court reviewing agency action under the 'arbitrary or capricious' standard is to ascertain whether the agency examined the relevant data and articulated a rational connection between the facts found and the decision made."

*Id.* The agency's decision must be upheld, if at all, on the basis articulated by the agency and not a different basis articulated by the government on appeal to this Court. *See id.* at 1575.

■ In addition to requiring a reasoned basis for the decision, the arbitrary and capricious standard requires the agency's action to be supported by the facts in the record. *See id.* In this circumstance, the Tenth Circuit has adopted the analysis of then-Judge Scalia in *Association of Data Processing v. Board of Governors*, 745 F.2d 677, 683 (D.C.Cir.1984). *See Olenhouse*, 42 F.3d at 1575. Under this standard, informal agency action will be set aside if it is not supported by substantial evidence. *See id.* This is not meant to substitute the "arbitrary or capricious" standard that applies to informal agency action with the more stringent standard applicable to formal agency action in § 706(2)(E). *See id.* This standard simply acknowledges that when assuring factual support, there is no substantive difference between what is required by the substantial evidence test because it is impossible to have a non-arbitrary factual judgment supported only by non-substantial evidence under the APA. *See Ass'n of Data Processing*, 745 F.2d at 684; *Olenhouse*, 42 F.3d at 1575.

■ Like *Olenhouse*, in this case the government did not focus on the arbitrary or capricious standard in its brief. Instead, it asserted that whether Black Butte's deferral payments were part of the "gross proceeds" (and thus subject to royalties under the federal coal leases) was the result of the agency interpreting its own regulations because "gross proceeds" is defined by regulation. Thus, the government reasons, its interpretation is entitled to "substantial deference." *See Olenhouse*, 42 F.3d at 1575 (describing the same argument made by the government in that case).

[But][t]he government misses the point. An agency's interpretation of its own

regulations may well be entitled "substantial deference"; but it nevertheless will be set aside if it is the product of a decision[ ]making *process* deemed arbitrary or capricious, *or* if it lacks factual support.

*Id.* at 1575–76 (emphasis added) (citing *Ass'n of Data Processing,* 745 F.2d at 683–684).

Given these standards, the Court turns to Black Butte's appeal.

## II. The Gross Proceeds Standard

Per regulations, royalties are assessed on the gross proceeds received by a lessee. Gross proceeds means the total monies and other consideration accruing to a coal lessee for the production of and disposition of coal. *See* 30 C.F.R. § 206.257 (1998). This standard was based, in part, upon the Fifth Circuit's *Diamond Shamrock* decision in that payments subject to royalties must be related to the ultimate production and disposition of coal. *See* 54 Fed.Reg. 1513. Judge Arness recognized this in his decision. This Court has no qualms with the meaning of the gross proceeds standard as it is set out by regulation. Black Butte does not dispute the *meaning* of the gross proceeds standard either, this standard is well established. Instead it asserts, in part, that there is no *factual support* for the proposition that Black Butte's deferral payments were related to the production or disposition of coal. To understand Black Butte's arguments, it is helpful to review the *Diamond Shamrock* decision as well as its progeny. Doing so also provides an efficient vehicle to address the parties' arguments in this case.

In *Diamond Shamrock,* the Fifth Circuit was called upon to determine whether the Secretary correctly found that take-or-pay payments were part of the "value" upon which royalties were assessed in the oil and gas context. *See* 853 F.2d at 1164. Take-or-pay payments (that were not later recouped) were those payments made to a gas or oil producer when the buyer failed to purchase a minimum quantity of gas or oil. The standard announced, which is used for royalty determination to this day, is that "[r]oyalty payments are due only upon the value of minerals actually produced, i.e., physically severed from the ground. No royalty is due on take-or-pay payments unless and until gas is actually produced and taken." *Id.* at 1168. The court found that the payments in question were not based on production, but instead were compensation for *failing* to purchase gas. *See id.* Therefore, to calculate such payments as "value for gas produced" would be illogical. *See id.* In sum, payments upon which royalties are assessed must ultimately be tied to gas extracted from the earth. *See id.*

This policy was further developed in *Independent Petroleum Association of America v. Babbitt,* 92 F.3d 1248 (D.C.Cir. 1996). In *Babbitt,* the court analyzed whether "settlement payments" were royalty bearing in light of the agency's decisions that take-or-pay payments were not royalty bearing. *See id.* at 1258. There, settlement payments were made by a buyer of gas effectively to terminate a long-term gas supply contract. The court found that the agency insufficiently distinguished between the two types of payments. *See id.* at 1259. The court found that under the facts of that case, take-or-pay payments and the contract settlement payments were functionally indistinguishable as to the calculation of royalties. *See id.*

> Both types of payments satisfy outstanding take-or-pay obligations, and both types can be recoupable or nonrecoupable. The only difference is whether negotiations follow between the parties over the cancellation of contractual obligations. We see no way in which the occurrence of these negotiations changes the functional nature of the payments for royalty purposes. The relevant question in both cases, under *Diamond Shamrock,* is whether the funds making up the payment actually pay for any gas severed from the ground. When take-

or-pay payments (or settlement payments) are recouped, those funds do pay for severed gas. But when the payments (of either variety) are nonrecoupable, the funds are never linked to any severed gas. Therefore, no royalties are accrued on those payments.

.          .          .          .          .

Neither take-or-pay payments nor take-or-pay settlement payments are royalty bearing until they are credited toward the purchase of make-up gas.

*Id.* at 1260.

■ There can be no mistaking the effect of these decisions: Payments are not royalty bearing unless they are connected to the severance of minerals from the ground. Recouping payments draws this connection. Indeed, Judge Arness concluded that take-or-pay cases illustrate "the general proposition that royalty collection by the Department depends on a link between lease production and money paid to a Federal lessee who produces a commodity subject to royalty." 141 I.B.L.A. at 192. In this regard, the Court concurs with Judge Arness' assessment.

Both of these decisions discuss the heart of royalty valuation. Simply because they involve gas and oil as opposed to coal is not a compelling reason to ignore them. The decisions' discussion of the assessment of royalties is functionally indistinguishable from the standard drafted in the regulations. Indeed, MMS recognized this when it drafted the gross proceeds standard to reflect the *Diamond Shamrock* decision. The Court thus disagrees with the government's assertion that these cases are not helpful. These decisions are helpful because they show when the agency has or has not found sufficient facts to show a connection between minerals extracted from the ground and payments made. Indeed, these cases simply reiterate what the agency has stated all along: Payments are not royalty bearing unless they are related to the severance of minerals, and factual support for finding the

connection must be found in the form of recoupment against the future purchase of minerals. Accordingly, it bears repeating that the meaning of the gross proceeds standard is not at issue in this case, at issue is only whether substantial evidence supports finding the deferral payments as part of the gross proceeds.

■ As the Court will explain, when the inquiry is framed in this light, it is apparent that the agency's decision cannot stand. The agency reasoned that in Black Butte's instance there was a connection between the coal produced and the deferral payments because, in part, in consideration for making the deferral payments the coal purchase agreement would remain in full force and effect (in other words, this was the real purpose behind the deferral agreements). See 141 I.B.L.A. at 193. Judge Arness characterized the agreements as actually extending an option to buy 3.3 million tons of coal. *See id.*

The mistake of the agency was that it completely ignored the facts before it. The facts are undisputed that the deferral payments were not for producing coal, but instead were payments made to Black Butte to reimburse it for idle time as a result of Idaho Power not taking delivery of coal. The payments were never recouped or credited against the future price of coal. Idaho Power still paid the full contract price for the coal. The government does not and cannot dispute that all parties to the deferral agreement intended that the purpose stated above was the reason for making the deferral payments.

Upon close inspection, these deferral payments and the payments at issue in *Diamond Shamrock* and *Independent Petroleum* are functionally indistinguishable. Like the payments at issue in those cases, the deferral payments were never recouped or credited against the future purchase of coal. Like those cases, not one fact supports the government's position that a connection between the production and disposition of coal and the deferral payments exist. Payments for reimburse-

ment of idle mine capacity does not forge a connection to the ultimate disposition of coal simply because Idaho Power eventually bought coal from Black Butte. To find a connection based on this fact alone would allow MMS to assess royalties for any payment made to a mineral lessee, no matter how tenuous the connection and how contrary the purpose of such payments.

But rather than looking to the facts, MMS relied on the adage that the agency must look behind the purported reasons for payments and find the "real" purpose of a given transaction to determine if payments are subject to royalties. *See id.* at 194. The agency was really saying that it did not believe Black Butte's reasons for the agreement. But the agency's decision does not bear scrutiny under this principle because it ignored all of the facts before it when it found the "real" substance of the agreement. The agency, in trying to get around the fact that the payments were never recouped, found that the payments were connected to coal production because the buyer essentially paid a price above and beyond the contract price for the coal when it made the deferral payments. While it is true that Black Butte eventually sold coal to Idaho Power and remained obligated under the underlying contract, when payments are for *idle* mine capacity, and not for coal production, finding a connection between coal production and the payments is fundamentally at odds with what the parties to this agreement intended. It seems that the agency simply failed to accept the facts before it and tried to find a way to make the payments subject to royalties. The agency may not rely on the principle announced above in the face of uncontroverted facts showing that the payments were for *idle* mine capacity and not for coal production. Moreover, as the Court will explain, MMS took a contrary position in an analogous case when the government attempted to use the same arguments it presents today. In the following case, MMS rejected the government's strongest rationale for assessing royalties in Black Butte's instance: That a

connection to coal production can be found here because the payments were to *defer* production rather than for *failing* to purchase to gas (as in the take-or-pay case).

In *Wolverine Exploration Co.,* MMS–88–0052–IND (May 2, 1990), MMS attempted to levy a royalty assessment on a lump sum payment. This lump sum payment was from a gas purchaser in settlement of the gas purchaser's payment obligations under a take-or-pay provision of the contract. The settlement agreement provided that the settlement payments were not refundable, but the gas remained committed to the purchaser at the price in effect at the time of production. *See id.* at 2. Wolverine ultimately produced and sold the gas to the same purchaser at the same price specified in the contract.

Just as in the case at bar, in *Wolverine* MMS argued that: Because the purchaser retained the exclusive right to the gas for which the settlement payments had been made, and the purchaser paid the full price for that same gas when it was later delivered, the "gross proceeds" received by Wolverine must include the purchase price *plus* the share of settlement payments attributable to that gas. *See id.* However, MMS Director, under the *Diamond Shamrock* rationale, rejected this argument. He found that there was no evidence that the settlement payments were connected to gas produced because the settlement payments were not recoupable against future production. *See id.; see also ARCO Coal Co.,* MMS–RVS–SM:89–0591 (July 7, 1989) (reaffirming the *Wolverine* position (in the coal lease context) and stating that the agency's position on royalty payments had been "recently clarified" by adopting the gross proceeds standard in 1989).

As previously stated, in the case at bar the government has argued that because Black Butte received "deferral payments," and because coal was eventually sold to the same party under the full contract price, the "gross proceeds" must include the price paid for the gas plus the amount of

"deferral payments" attributable to the coal. But the *Wolverine* decision stands for just the opposite proposition. *Wolverine* stands for the proposition that just because a mineral commodity is ultimately produced and sold to the same party who made a prior payment to the producer, the prior payment does not become royalty bearing. Instead, for payments to be royalty bearing, the payments must be related to the subsequent production of coal in the form of credits or recoupments against the price paid for coal. The fact that MMS has previously taken an inconsistent position with very analogous facts certainly diminishes the credibility of the agency in the eyes of this Court.

Indeed, the Court of Claims recognized that the government has taken inconsistent positions and, as a result, lent less weight to the government's position in a prior dispute involving one of the leases at issue in this case. The Court of Claims analyzed the royalty provision of Lease W–6266 in *Black Butte Coal Co. v. United States*, 27 Fed. Cl. 699, 703, *vacated on other grounds*, 14 F.3d 612 (Fed.Cir.1993). In disagreeing with the government on whether certain payments were subject to royalties, the court of claims reasoned:

> While the IBLA's decision generally is entitled to deference as to findings of fact, no findings of fact are disputed. Moreover, whatever deference to which the Board might otherwise be entitled as to interpretive matters within its expertise is lessened in this case by [the Department of Interior's] inconsistent interpretations of, ... and its monetary interest in, the lease.

*Id.* at 703.

This Court heeds the court of claims' guidance and bears the monetary interest and inconsistent interpretations of DOI in mind when determining the issues in this case. Undeniably, it is in the best interest of DOI to find that the deferral payments were subject to royalties. Further, MMS found that payments were not part of the gross proceeds under nearly identical circumstances in the *Wolverine* decision. These things, combined with the fact that the government chose to disregard every piece of evidence pointing toward finding no connection between the payments and the production of coal makes the Court's decision less complicated. Simply put, while the Court agrees with the government's stated definition of gross proceeds (as does Black Butte) the Court must find that substantial evidence does not support finding that the payments in question were part of the gross proceeds.

Finally, the Court notes that the Sixth Circuit's decision, *In re Century Offshore Management Corp.*, is not helpful to the government's cause and is distinguishable from the instant case. 111 F.3d 443 (6th Cir.1997). In that case, Century was involved in a gas and oil lease subject to the "gross proceeds" rule for determining royalties. *See id.* at 446. In 1991, Century received a lump sump settlement payment from Enron, who was obligated to purchase gas under a take-or-pay contract. *See id.* at 446–47. In consideration for this lump sum payment, Enron was relieved of its obligation to purchase gas under the contract. *See id.* at 447. Simultaneously, Enron and Century entered into "replacement contracts" in which Enron agreed to purchase gas from Century under different price terms. *See id.* The government charged that Century owed royalties on this lump sum payment because this payment was part of the gross proceeds paid for gas. *See id.*

The *Century* court interpreted *Diamond Shamrock* as requiring that payments subject to royalties have some nexus with the production of the commodity at issue. *See id.* at 449. The court found that the necessary nexus existed under the facts of that case. *See id.* The Court noted that in *Diamond Shamrock*, one piece of paper established recoupability and hence the necessary nexus with production. *See id.* at 450. However, in *Century*, the court was faced with two pieces of paper (the lump sum payment and the superseding

contract) which the appellant characterized as independent. *See id.* The court found that the first contract termination was merely a formality; that is, under the new contract, Century eventually bought all of the gas it would have been obligated to buy under the original contract. *See id.* The lump sum payment (in conjunction with the contract termination) and the new contract were executed simultaneously. *See id.* Thus, the two transactions were substantively only one. *See id.* The lump sum payments, when viewed in conjunction with the new contract, were in reality payments for gas that were later recouped when gas was bought under the new contract. *See id.* Therefore, the court determined that because this was an "advance" payment for the future delivery of gas, the necessary nexus between production and payment existed, and the payment was subject to royalties. *See id.*

Conversely, the case at bar is factually distinct from *Century.* The court in *Century* found that the lump payment and termination, along with the new contract, were so close in time and purpose that they were properly viewed as one transaction. The court in *Century* relied on the principles of substitution contracts in coming to this conclusion. *See id.* at 448. However, here the deferral payment contracts and the underlying coal contracts can in no way be viewed as one transaction. The deferral contracts and underlying coal contracts were executed years apart. The explicit purpose of the deferral contracts was to reimburse Black Butte for idle mine capacity—not to "terminate" a contract and substitute it for a new contract like in *Century.* Neither this Court nor the agency can reasonably view Black Butte's deferral payments like the "sham transaction" found in *Century.*

After all, the sham rationale is the ultimate reason the *Century* court came to the conclusion it did. Century tried to convince the court that the lump sum payments were not connected to the later purchase of gas. But given the simultaneous nature of the two transactions and the ultimate purchase of gas, the court found that Century's characterization of the payments as "lump sum" was merely a sham. The same cannot be said in our case. Black Butte has put forth uncontroverted evidence that the payments were for idle mine capacity, and not for coal production. This explicit purpose is diametrically at odds with finding the payments as having a nexus to coal production. Further, the payments were years apart from the coal purchase contracts. There was no simultaneous transaction like that in *Century.* When one understands these facts, it is clear that this is just a different case than *Century.*

Therefore, for the reasons stated, the Court **FINDS** that DOI's decision that the deferral payments were part of the gross proceeds is not supported by substantial evidence. The royalty assessment against those payments must be rescinded.

### Conclusion [3]

For the foregoing reasons, the Court **REVERSES** the Department of Interior's decision. MMS's royalty assessment must be rescinded. This matter is thus remanded for further proceedings, if any need to be held, consistent with this opinion.

---

3. Because the Court has found that, assuming arguendo that the government could bring this action, it need not confront Black Butte's statute of limitations argument.