The SHOSHONE INDIAN TRIBE OF THE WIND RIVER RESERVATION, WYOMING, Plaintiff,

v.

The UNITED STATES, Defendant.

The Arapaho Indian Tribe of the Wind River Reservation, Wyoming, Plaintiff,

v.

The United States, Defendant.

Nos. 458–79 L, 459–79 L.

United States Court of Federal Claims.

Sept. 26, 2003.

---

Steven D. Gordon, Washington, DC, for the Shoshone Indian Tribe. Lynn E. Calkins and Maria Whitehorn Votsch, Washington, DC, John C. Shumacher, Fort Washakie, WY, and Jerome L. Levine and James K. Kawahara, Los Angeles, CA, of counsel.

Richard M. Berley, Seattle, WA, for the Arapaho Indian Tribe. Brian W. Chestnut, Seattle, WA, of counsel.

Elsie B. Kappler, with whom was Thomas L. Sansonetti, Assistant Attorney General, U.S. Department of Justice, Washington, DC, for defendant. Thomas Bartman and Faith M. Lucchesi, Washington, DC, of counsel.

## OPINION

HEWITT, Judge.

Before the court are Defendant's Motion for Summary Judgment on Plaintiff[s'] Claims of Breach of Trust on Plaintiffs' Take–or–Pay Claims (Def.'s Take–or–Pay Mot. or defendant's Take–or–Pay Motion) and Defendant's Motion for Summary Judgment as to Various Claimed Breaches in

MMS Royalty Payment Processing (Def.'s MMS Mot. or defendant's MMS Motion). For the following reasons, defendant's Take–or–Pay Motion is DENIED and defendant's MMS Motion is DENIED except as to transportation allowances prior to 1988, and late payment interest prior to 1981, as to which it is GRANTED.[1]

### I. Background

This case was filed in 1979 and has been divided into four phases for adjudication.[2] Order of June 13, 2001. The current phase involves plaintiffs' claims of breach of fiduciary duty by the Minerals Management Service (MMS) and its predecessors in the collection, management, and payment of royalties. Tribes' Brief Identifying the Issues to be Resolved at Trial of Oil and Gas Phase One (Pls.' Issues Brief) at 2. This opinion addresses defendant's actions with respect to a 1989 settlement agreement (Arco settlement) on which plaintiffs (plaintiffs or the Tribes) claim additional royalties, and the actions of MMS in collecting royalties allegedly owed to the Tribes from 1982 to 2000.

The Arco settlement was an agreement reached between Atlantic Richfield Company, Arco Oil and Gas Company, and Arco Natural Gas Marketing, Inc. (collectively, Arco), as lessee/producer, and MDU Resources Group, Inc. and Williston Basin Interstate Pipeline Company (collectively, MDU), as purchaser, on October 17, 1989, in settlement of a case pending in the 95th District Court of Dallas County, Texas, captioned *Atlantic Richfield Co. v. MDU Resources Group. Id.* at 16. Under the terms of the Arco settlement, MDU paid Arco $39 million. Arco paid royalties to plaintiffs on 53% of this amount. *Id.* at 16–17. Arco attributed 45% of the settlement amount to "Take–or–Pay at Sec. 107 Pricing."[3] *See* Appendix to Tribes' Supplemental Opposition to Defendant's Motion for Summary Judgment on Plaintiffs' Claims of Breach of Trust on Plaintiffs' Take–or–Pay Claims (Pls.' Take–or–Pay Supp.App.) at 410 (providing Arco's breakdown of the settlement payment). Arco did not pay royalties on this portion of the settlement on the grounds that royalties were not due under 30 C.F.R. § 206 (1988). *See* Pls.' Issues Brief at 19.

The "Take–or–Pay" portion referred to a provision in most long-term gas sales contracts entered into before the mid–1980s. Def.'s Take–or–Pay Mot. at 6. This provision "obligated the purchaser to take a specified minimum volume of gas during an identified period or to pay for that quantity even if not taken in full." *Id.* Payments under take-or-pay provisions of gas sales contracts are not royalty-bearing, except when the payments are later credited toward the purchase of gas actually taken. *See, e.g., Indep. Petroleum Ass'n of Am. v. Babbitt,* 92 F.3d 1248, 1260 (D.C.Cir.1996) (stating that take-or-pay payments are not "royalty bearing unless and until they are credited toward the purchase of make-up gas"). This is because "the controlling statutes contemplated royalty payments on the value of the *'production'* of gas." *Id.* at 1253. This dispute concerns the propriety of the government's failure to challenge Arco's allocation of part of the settle-

1. Also before the court is the Motion of Defendant to Strike Certain Exhibits to the Tribes' Supplemental Response to the Government's Motion for Summary Judgment on the Issue of MMS Royalty Payment Processing or, in the Alternative, for Further Discovery. This motion is addressed in footnote 18.

2. The facts outlined here include only those relevant to the current issues before the court. Additional historical background can be found in the court's earlier opinions. *See Shoshone Indian Tribe of the Wind River Reservation v. United States,* 56 Fed.Cl. 639 (2003) (granting in part and denying in part defendant's Motion to Dismiss and Motion for Summary Judgment in first phase of briefing); *Shoshone Indian Tribe of the Wind River Reservation v. United States,* 51 Fed. Cl. 60 (2001) (deciding statute of limitations issue), *appeal docketed,* No. 03–5036 (Fed.Cir. Dec. 23, 2002); *Shoshone Indian Tribe of the Wind River Reservation v. United States,* 52 Fed.Cl. 614 (2002) (deciding pre-trial motions regarding claims for management of the Tribes' sand and gravel); *see also Shoshone Tribe of Indians v. United States,* 299 U.S. 476, 57 S.Ct. 244, 81 L.Ed. 360 (1937) (providing history of the joint occupancy by the Tribes of the Wind River Reservation).

3. "Take–or–Pay payments are payments for minerals of which the purchaser has opted not to take delivery but for which the purchaser must still pay under the terms of a purchase contract ...." Pls.' Issues Brief at 17 n. 10.

ment to take-or-pay amounts, which were not royalty-bearing for the Tribes.

Plaintiffs claim that the government breached its duty to the Tribes by not· collecting royalties on the portion of the settlement attributed to "Take–or–Pay." Transcript of Oral Argument held on July 22, 2003(Tr.) at 6. In response, defendant focuses on the argument that there was no breach because plaintiffs were responsible for auditing the settlement under a cooperative agreement. *Id.* at 40.

Since approximately 1982, MMS has operated a computerized system that accounts for unpaid or underpaid financial obligations, including royalty payments. Def.'s MMS Mot. at 5. Lessees submit a form to MMS that includes the lease number, sales month, product volume, royalty calculation, and allowable deductions. *Id.* In 1993, the Tribes entered into a cooperative agreement (Cooperative Agreement) with the government under 30 U.S.C. § 1732 (2000). *Id.* at 6. According to defendant, under the Cooperative Agreement "the Tribes undertake the actual auditing of all oil and gas royalty payments arising from leases on the Reservation." *Id.* at 7 (citing Def.'s MMS Mot., Declaration of Deborah Gibbs Tschudy (Tschudy Decl.) Ex. 2, at 1).

Plaintiffs claim that the MMS system broke down-with the result that the government did not collect the full amount of royalties due to them under the leases. Tr. at 54. Specifically, plaintiffs complain of three failings by defendant. First, plaintiffs contend that MMS failed to perform a "major portion" analysis to determine the value upon which royalties were to be determined. *Id.* at 55–56.[4]  Second, plaintiffs contend that MMS failed in its duty to review transporta-

tion allowances claimed by oil companies. *Id.* at 59–60. Third, plaintiffs contend that late payment interest was not collected. *Id.* at 78. Defendant argues that plaintiffs' breach of trust claims are barred because "the [C]ooperative [A]greement defines the parties['] obligations ... from 1988 forward," *id.* at 84, and limited the government's responsibility. *Id.* at 85–88.

## II.  Discussion

### A.  Motion for Summary Judgment Standard

Summary judgment is warranted when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact that might significantly affect the outcome of the litigation is material. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. Disputes over facts that are not outcome determinative will not preclude the entry of summary judgment. *Id.* at 247–48, 106 S.Ct. 2505.

The party moving for summary judgment bears the initial burden of demonstrating the absence of any genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party demonstrates an absence of a genuine issue of material fact, the burden then shifts to the non-moving party to show that a genuine issue exists. *Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1562 (Fed.Cir.1987). The movant is also entitled to summary judgment if the non-movant fails to make a showing sufficient

---

4.  Plaintiffs contend that the applicable· regulations define "major portion" as:

> [T]he highest price paid or offered at the time of production for the major portion of oil production from the same field. The major portion will be calculated by using like-quality oil sold under arm's-length contracts from the same field (or, if necessary to obtain a reasonable sample, from the same area) for each month.

30 C.F.R. § 206.52(a)(2)(ii) (1996); 30 C.F.R. § 206.102(a)(2)(ii) (1988), *cited in* Tribes' Supplemental Response to the Government's Motion for Summary Judgment as to Various Claimed Breaches in MMS Royalty Payment Processing (Pls.' MMS Supp.) at 3 n. 3. Plaintiffs further argue that "[t]he major portion price is determined by arraying such prices and, starting from the bottom, determining the price at which 50% (by volume) plus one barrel of oil is sold. All oil sales made below the major portion (*i.e.*, median) price are valued at the median price for purposes of determining the royalty to be paid." Pls.' MMS Supp. at 3 n. 3. Defendant does not appear · to dispute this characterization of the major portion analysis.

to establish an element of its case on which it will bear the burden of proof at trial. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548. The court must resolve any doubts about factual issues in favor of the party opposing summary judgment, *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.,* 755 F.2d 158, 163 (Fed.Cir.1985), to whom the benefits of all favorable inferences and presumptions run. *H.F. Allen Orchards v. United States,* 749 F.2d 1571, 1574 (Fed.Cir.1984), *cert. denied,* 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).

The framework within which this dispute must be resolved has recently been restated by the United States Supreme Court in *United States v. Navajo Nation,* 537 U.S. 488, 123 S.Ct. 1079, 155 L.Ed.2d 60 (2003) (*Navajo Nation*), and *United States v. White Mountain Apache Tribe,* 537 U.S. 465, 123 S.Ct. 1126, 155 L.Ed.2d 40 (2003) (*White Mountain Apache*). To defeat defendant's motions, plaintiffs must adduce evidence sufficient to demonstrate that the government had specific fiduciary or other duties established by a substantive source of law and that the government failed to perform those duties. *Navajo Nation,* 537 U.S. at 506, 123 S.Ct. 1079. "If that threshold is passed, the court must then determine whether the relevant source of substantive law 'can fairly be interpreted as mandating compensation for damages sustained as a result of a breach of the duties [the governing law] imposes.'" *Id.* (alteration in original) (quoting *United States v. Mitchell,* 463 U.S. 206, 219, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983) (*Mitchell II*)).[5]

## B. Take–or–Pay Claim

### 1. Fiduciary Duties

Plaintiffs argue that royalties on the entire Arco settlement were due to the Tribes and that the government had a duty to collect them. Tr. at 6. In particular, the Tribes argue that the government should have challenged Arco's allocation of that settlement between royalty-bearing (53%) and non-royalty-bearing (45%) claims. *See id.* Plaintiffs argue that this duty can be found most plainly at 53 Fed.Reg. 45,082, which states that the government "will carefully review all situations to ensure that lessees do not improperly attempt to use contractual devices to avoid royalties by denominating as take-or-pay or advance payments other consideration which is part of the gross proceeds for production." *Id.* at 8 (quoting 53 Fed.Reg. 45,-082 (Nov. 8, 1988) (codified at 30 C.F.R. pt. 206)). Further, plaintiffs contend that defendant has "an obligation to insure the 'prompt and proper collection and disbursement of oil and gas revenues.'" *Id.* at 44 (citing 30 U.S.C. § 1701(b)(3) (2000) (Joint Appendix of Regulations (Jt.App.) at A–11)).[6]

Defendant counters that it "had a duty to collect royalties [only] on the royalty-bearing portions of the Arco settlement." *Id.* at 32–33. Because there is no duty to contemporaneously audit the settlement, defendant argues, its duty is limited to collecting the amount Arco allocated to the settlement of royalty-bearing claims. *Id.* at 32–34. According to defendant, it has the authority to audit, but is not required to do so in every instance. *See id.* at 38–39 (arguing that "the absence of an affirmative duty [to audit under 30 U.S.C. § 1701(a)(3) (Jt.App. at A–11)] could be interpreted to mean that [the gov-

---

**5.** While the quoted language from *Mitchell II* might suggest that there is no role for the claimant in determining whether the substantive source of law is money mandating, other language in *Mitchell II* states that the *"claimant must demonstrate that the source of substantive law he relies upon can fairly be interpreted as mandating compensation by the Federal Government for damages sustained."* 463 U.S. at 216–17, 103 S.Ct. 2961 (citation omitted) (emphasis added). Reading the language of *Navajo Nation* and *Mitchell II* together, the court concludes that the claimant initially must present evidence and argument demonstrating that the substantive source of law is money mandating. Under *Navajo Nation* it is then a question of law for the court

to determine whether the substantive law mandates compensation. *Navajo Nation,* 537 U.S. at 506, 123 S.Ct. 1079.

**6.** In an order dated May 15, 2003, the court ordered the parties to develop a joint appendix of all regulations and statutes that apply to this case, including the dates those regulations and statutes were in effect. The parties complied with this order by filing their first edition of the Joint Appendix on June 18, 2003, and a second edition on July 23, 2003. The court relied on and cites to the July 23, 2003 Joint Appendix in this opinion.

ernment does not] have that duty.").[7]

■ Under *Navajo Nation*, in order for a duty to be imposed on the government, there must be more than a general trust relationship between the United States and an Indian tribe. *See Navajo Nation*, 537 U.S. at 506, 123 S.Ct. 1079 (stating that a general trust relationship alone is "insufficient" to support the existence of fiduciary duties). "Instead, the analysis must train on specific rights-creating or duty-imposing statutory or regulatory prescriptions." *Id.* While the government's duty must be found in the statutory or regulatory language, this language need only be "reasonably amenable to the reading that it mandates a right of recovery in damages." *White Mountain Apache*, 537 U.S. at 473, 123 S.Ct. 1126. When statutes and regulations give the United States fiduciary duties that go "beyond the 'bare' or minimal level [they can] 'fairly be interpreted as mandating compensation' through money damages if the Government faltered in its responsibility." ' *Id.* at 474, 123 S.Ct. 1126 (quoting *Mitchell II*, 463 U.S. at 224–26, 103 S.Ct. 2961).

■ As a threshold matter, it is clear to the court that there is an obligation imposed by law on defendant to ensure the prompt and proper collection and disbursement of royalties. That obligation is found in the Federal Oil and Gas Royalty Management Act (FOGRMA), 30 U.S.C. §§ 1701–1757 (2000). *See* 30 U.S.C. § 1701(b)(3) (Jt.App. at A–11) (stating that a purpose of FOGRMA is "to require the development of enforcement practices that ensure the prompt and proper collection and disbursement of oil and gas revenues to ... Indian lessors"). FOGRMA establishes this duty and prescribes the means for discharging it, stating that "[t]he Secretary [of the Interior] shall establish a comprehensive inspection, collection and fiscal and production accounting and auditing system to provide the capability to accurately determine oil and gas royalties ... and to collect and account for such amounts in a timely manner." 30 U.S.C.

§ 1711(a). The Congressional findings in section 1701 of FOGRMA support the court's conclusion that fiduciary duties exist: "[I]t is essential that the Secretary initiate procedures to improve methods of accounting for [oil and gas] royalties and payments and to provide for routine inspection of activities related to the production of oil and gas on such lease sites." 30 U.S.C. § 1701(a)(3) (Jt.App. at A–10). While these statutes do not mandate that the government audit every transaction that comes before it, they do establish clear duties with respect to the collection of royalties, as required by *Navajo Nation*. *See* 537 U.S. at 506, 123 S.Ct. 1079 (requiring "rights-creating" or "duty-imposing" statutes or regulations). These statutes can also be inferred to be money mandating because they are "duty-imposing," *see id.*, in that they impose an obligation on defendant to collect moneys on behalf of Indian tribes. Therefore, the court finds that plaintiffs have established that defendant had a duty beyond the general fiduciary duty owed to Indian tribes by the government and that plaintiffs may recover money damages for any breach. The court now considers whether on summary judgment the court should find that defendant was not required to have sought royalties on the take-or-pay portion of the Arco settlement.

### 2. Breach

The Arco settlement concluded litigation begun in 1986 which sought over $200 million from MDU Resources Group, Inc. and Williston Basin Interstate Pipeline Company for breach of a gas purchase contract for gas from the Riverton Dome area of Wyoming. Pls.' Take–or–Pay Supp.App. at 324–27. This contractual relationship began on July 30, 1962, and was amended in 1966, *id.* at 258, 1974, *id.* at 260, 1980, *id.* at 262, 1981, *id.* at 265, 1982, *id.* at 286, and, finally, on October 17, 1989, *id.* at 327. Pursuant to the October 17, 1989 amendment, the contract expired on July 31, 1992. *Id.* at 331. The October 17, 1989 amendment was executed on the same day as the Arco settlement

---

7. Defendant also argues that the language quoted by plaintiffs from 53 Fed.Reg. 45,082 appears in the regulatory preamble, and therefore cannot be relied on to create a duty under *Navajo Nation*.

Tr. at 43. As the court does not rely on Fed.Reg. 45,082 as the source of the duty under *Navajo Nation*, it is unnecessary to address defendant's final argument at this time.

documents. *See id.* at 327 (Amendment Agreement dated Oct. 17, 1989); Appendix to Tribes' Opposition to Defendant's Motion for Summary Judgment on Plaintiffs' Claims of Breach of Trust on Plaintiffs' Take-or-Pay Claims (Pls.' Take-or-Pay App.) at 10 (Compromise Settlement Agreement dated Oct. 17, 1989).

According to plaintiffs, "the key issue is trying to determine if there was one transaction at the time that the parties terminate[d] the existing pricing and volume terms of the contract, and replace[d] them with new pricing and volume terms." Tr. at 14–15. Under the case law, plaintiffs argue, the court should consider a number of nonexclusive factors, including: whether the parties intended a continuing relationship; whether much of the gas identified in the original contract was delivered under the replacement contract; to whom the gas was ultimately sold; the dates of delivery; and the price per unit of gas sold. *Id.* at 15. If a settlement and contract amendment can fairly be viewed as a single transaction, royalties are due on the entire settlement. *See id.* at 14–15. In such a case, plaintiffs argue, the government breaches its duty if it does not collect royalties on the full amount. *See* Tribes' Supplemental Opposition to Defendant's Motion for Summary Judgment on Plaintiffs' Claims of Breach of Trust on Plaintiffs' Take-or-Pay Claims at 18, 21 (Pls.' Take-or-Pay Supp.) (claiming that when one transaction is found to exist, royalties are due, and the government should collect them).

Plaintiffs contend that the evidence here points to the conclusion that there was a single transaction, and therefore royalties are owed on the entire settlement amount. *Id.* at 18–21. Plaintiffs point out that under the new gas purchase contract, the volume was amended from 26 Mmcfd to 8.3 Mmcfd,[8] a substantial decrease. *Id.* at 18–19. Additionally, the parties expected the purchase of gas to continue forward from the time the amendment was executed, in October of 1989, until the end of July, 1992, demonstrating

that the parties intended a continuing relationship. Tr. at 18. Plaintiffs state that the gas identified in the new gas contract was delivered. *See id.* at 19 (citing Pls.' Take-or-Pay Supp.App. at 441, showing purchase of gas up to November, 1991). Plaintiffs also argue that because the allocation of the settlement was never negotiated by the parties, there was no basis for the government to accept it. *Id.* at 20, 24. Noting plaintiffs' difficulties in obtaining evidence with respect to the allocation of the settlement to royalty-bearing and non-royalty-bearing claims, plaintiffs argue that any problems arising from the unavailability of evidence so long after the events occurred should be charged against the government. *Id.* at 27.

■ While plaintiffs focus on their entitlement to royalties on the full settlement amount, defendant argues that there could not be a breach by the government because plaintiffs took over audit responsibilities under the Cooperative Agreement between the parties. *See* Def.'s Take-or-Pay Mot. at 16; *see also* Tschudy Decl. Ex. 2 (Cooperative Agreement). While defendant acknowledges that turning over the audit responsibility did not absolve it of the government's fiduciary duty to the Tribes, it insists that "somewhere along the line, the United States should be entitled to rely on obligations that the Tribes assumed." Tr. at 40. Defendant relies specifically on 30 U.S.C. § 1701(b)(5), *id.* at 41, which states that one of the purposes of FOGRMA is "to effectively utilize the capabilities of the States and Indian Tribes in developing and maintaining an efficient and effective Federal royalty management system." 30 U.S.C. § 1701(b)(5) (Jt.App. at A–11).

Further, defendant argues that plaintiffs themselves failed to exercise diligence in pursuing an audit here. *See* Tr. at 42 (arguing, among other things, that plaintiffs did not explain how their failure to obtain additional documents precluded them from auditing the Arco settlement). Defendant points out that MMS scheduled an audit of the Arco settlement for 1995. Defendant's Supplemental·

---

8. "Mmcfd" is an abbreviation for gas volume of one million cubic feet per day. *See* Pls.' Take-or-Pay Supp. at 18–19 (giving the abbreviation for twenty-six million cubic feet per day as "26 MMCFD").

Brief Supporting Defendant's Motion for Summary Judgment on Plaintiffs' Claims of Breach of Trust on Plaintiffs' Take–or–Pay Claims (Def.'s Take–or–Pay Supp.) at 10. Defendant argues that plaintiffs took over this responsibility, then did not follow through. *See id.* at 11 (stating the Tribes "fail[ed] to carry out responsibilities assumed at their own request"). Defendant contends that plaintiffs "could have easily performed some calculations and come up with their own conclusions and given these to MMS." Tr. at 42.

Defendant also argues that the language of FOGRMA supports its position that the Cooperative Agreement and the extension of audit authority to the Tribes limited the government's responsibility here. *Id.* at 85–88. Defendant contends that "entering into the [C]ooperative [A]greement was entirely consistent with the United State[s'] duty as a fiduciary." *Id.* at 89. The Cooperative Agreement was an enforceable contract and, according to defendant, "redefines the obligations of the parties to one another." *Id.* To decide otherwise would, defendant argues, place the government in an "untenable position because the only way [the government] could then satisfy [its] fiduciary duties … would be to virtually duplicate all of [the Tribes'] audits, and that would defeat the entire purpose of the [C]ooperative [A]greement." *Id.* at 97. Defendant argues this is because the statutory language itself contemplates the parties "sharing" audit responsibility when cooperative agreements are in place. *Id.* at 99–100 (citing 30 U.S.C. § 1753(b) (Jt.App. at A–25)).

Plaintiffs counter that cooperative agreements under FOGRMA are intended to enhance, not diminish, the government's trust responsibilities. *Id.* at 116 (citing 30 U.S.C. § 1701(b)(5) (Jt.App. at A–11)). Under 30 U.S.C. § 1701(a)(4), plaintiffs argue, "'the Secretary should aggressively carry out his trust responsibility in the administration of Indian oil and gas.'" *Id.* (quoting 30 U.S.C. § 1701(a)(4) (Jt.App.A–10)). Plaintiffs also argue that under the regulations the Tribe is a "junior partner" of MMS. *Id.* at 117–18. "It is a federal royalty system. It[ is] not a tribal royalty management system …." *Id.*

(citing 30 C.F.R. § 228.1 (1984) (Jt.App. at D–73)). In the Tribes' view, their position is supported by section A.1. of the Cooperative Agreement, which states, "Nothing in this agreement will serve to abrogate the rights of either party under [FOGRMA]." *Id.* at 118 (quoting Tschudy Decl. Ex. 2, at 3 (Cooperative Agreement))

Certain facets of the statute are difficult to construe, in particular, the section of FOGRMA regarding how FOGRMA relates to other statutes. 30 U.S.C. § 1753(b) (Jt.App. at A–25). Section 1753(b) provides that "[n]othing is this chapter shall be construed to reduce the responsibilities of the Secretary to ensure prompt and proper collection of revenues … *or* to restrain the Secretary from entering into cooperative agreements … to share royalty management responsibilities …." 30 U.S.C. § 1753(b) (Jt.App. at A–25) (emphasis added). The phrases are potentially in conflict because, if entering into a cooperative agreement does not reduce the responsibilities of the government, that circumstance could restrain the government from entering into cooperative agreements.

Defendant argues that, in examining the relationship between the obligations joined by the word "or" in section 1753(b) ("to reduce the responsibilities or to restrain [entry] into cooperative agreements"), the court should focus on the portion of the statute following "or," where "the important language lies." Tr. at 94. The use of the word "share," defendant continues, "clearly … contemplates joint responsibilities." *Id.* at 99–100. However, "a legislative body is presumed not to have used superfluous words. Courts are bound to accord meaning, if possible, to every word in a statute." 2A Norman J. Singer, *Statutes and Statutory Construction* § 47:38, at 392 (6th ed.2000). While the court rejects the argument that it should ignore any of the language in section 1753(b), the court nevertheless reviews the legislative history to determine the weight to accord to each part of the section and to determine if there is any basis for defendant's arguments that the cooperative agreement language of 30 U.S.C. § 1732 affects the parties' responsibilities here. *See id.* § 48:01, at 413 ("[T]here is no rule which forbids anything

that might aid in the construction of words used in a statute no matter how clear they may be.") Here, the legislative history, when viewed together with the relevant portions of the statute, supports the conclusion that the Cooperative Agreement does not diminish the trust duty owed to plaintiffs by defendant.

Both the House and Senate reports for FOGRMA support a reading that the intent of the legislation was to improve the government's discharge of its responsibility to collect royalties. FOGRMA came about in response to the "shortcomings of the royalty management system." H.R.Rep. No. 97–859, at 15 (1982), *reprinted in* 1982 U.S.C.C.A.N. 4268, 4269; *see also* S.Rep. No. 97–512, at 8 (1982) ("Since 1959, the General Accounting Office has been reporting on the need for major improvements in the Federal Government's oil and gas royalty accounting system."). The purpose of the legislation, according to the House, was to *"reaffirm and expand* the authorities and responsibilities of the Secretary of the Interior in the management of the Federal oil and gas royalty accounting system ... [and] to fulfill the trust responsibility of the United States for the administration of Indian oil and gas resources." H.R.Rep. No. 97–859, at 15 (1982), *reprinted in* 1982 U.S.C.C.A.N. 4268, 4268 (emphasis added). The Senate stated that the purpose of the legislation is to *"clarify the authorities of the Secretary ... and to encourage enforcement practices necessary to ensure proper collection of revenues."* S.Rep. No. 97–512, at 8 (1982) (emphasis added). The Senate Energy and Natural Resources Committee also explained that it did "not intend[ ] in any way to expand the trust responsibility," S.Rep. No. 97–512, at 11 (1982), when it added to the "Findings and Purposes" section of the legislation the statement that "the Secretary should aggressively carry out his trust responsibility in administration of Indian oil and gas," *id.* at 2, language which remained in the bill that passed Congress, 30 U.S.C. § 1701(a)(4) (Jt.App. at A–10). The Senate's explanation that it did not intend "to expand the trust responsibility" does not, however, support an inference that the Senate intended to *contract* the government's trust responsibilities. And, re-

gardless of differences in approach in the reports (to "expand the authorities" or to "clarify the authorities"), the legislation was introduced in both houses as a response to abuses of the royalty management system that "resulted in substantial loss of revenues to the U.S. Government, States, and Indian Tribes." Letter from James G. Watt, Secretary, U.S. Department of the Interior, to George Bush, President (Mar. 24, 1982), *reprinted in* S.Rep. No. 97–512, at 29 (1982).

The legislative history says little about cooperative agreements. Both the House and the Senate reports state that the Secretary has discretion regarding whether to enter into cooperative agreements. *See* H.R.Rep. No. 97–859, at 36 (1982), *reprinted in* 1982 U.S.C.C.A.N. 4268, 4290 ("[T]he Committee has not made it mandatory for the Secretary to use such contractual authority with a State or Indian tribe."); S.Rep. No. 97–512, at 18 (1982) ("It is the intent of the Committee that the Secretary use his discretion to negotiate cooperative agreements ...."). However, this discretion cannot, in the court's view, be read to mean that Congress intended to decrease the responsibilities of the government when it entered into cooperative agreements.

When Congress intends to provide for the delegation of responsibilities by the Secretary, it uses clear language for the purpose. The language of section 1735 of FOGRMA relating to the delegation of royalty collection and related activities gives the Secretary discretion to "delegate" authority to states to conduct inspections, audits and investigations. 30 U.S.C. § 1735(a). The statute does not authorize the Secretary to "delegate" this authority to Indian tribes. *See* 30 U.S.C. § 1735(a) (stating that "the Secretary is authorized to delegate ... all or part of the authorities and responsibilities of the Secretary ... to any State," but omitting mention of Indian tribes). This difference between the treatment of states and Indian tribes strongly supports the view that the government is not authorized by FOGRMA to delegate its trust responsibilities to the Tribes. *See* Singer, *supra*, § 47:23, at 304–07 ("[W]here a form of conduct, the manner of its performance and operation, and the

persons and things to which it refers are designated, there is an inference that all omissions should be understood as exclusions."). The differences in treatment between agreements with states and Indian tribes, coupled with the overarching purpose of FOGRMA—to ensure that the federal government, state governments and Indian tribes receive all the royalties to which they are entitled—appear to the court to be inconsistent with any diminution of the government's trust responsibilities to the Indian tribes.

In light of this history and the language of FOGRMA that "nothing in this chapter shall be construed to reduce the responsibilities of the Secretary to ensure prompt and proper collection," 30 U.S.C. § 1753(b) (Jt.App. at A-25), the court believes that the Cooperative Agreement does not operate to reduce the government's fiduciary responsibility here and that FOGRMA did not intend or require that it do so. The court concludes, as plaintiffs argue, that FOGRMA was designed to enhance the effectiveness of the discharge by the Secretary of his responsibilities, rather than to shift those responsibilities to the Indian tribes. The portions of FOGRMA that allowed for cooperative agreements reflected the reality that, at the time the legislation was passed, the Secretary was not fulfilling his responsibilities to the Indian tribes. The provisions of the Cooperative Agreement in this case were intended to aid the Secretary in carrying out these responsibilities, not to prevent the Tribes from being compensated when the Secretary did not do so. If the failure to collect additional royalties on the Arco settlement was a breach, the Cooperative Agreement does not excuse it.

■ Whether the government breached its trust obligation by failing to collect additional royalties on the Arco settlement depends on whether additional royalties were legally due. Arco's "MDU Settlement" breakdown allocated portions of the settlement to "Take-or-Pay at Sec. 107 Pricing" and six other categories. Def.'s Take–or–Pay Mot. Ex. 4. Royalties were paid on over half of the settlement, but not on the 45% allocated to "Take-or–Pay at Sec. 107 Pricing." *Id.* Because the

obligation to pay royalties to the Tribes cannot be avoided merely by characterizing a payment in a way that makes it non-royalty-bearing, *Chevron USA Prod. Co. v. U.S. Dep't of Interior,* 254 F.Supp.2d 107, 115 (D.D.C.2003), the court must examine the underlying economic reality of the Arco settlement payment.

The litigation which gave rise to the Arco settlement payment arose out of the deregulation of the natural gas market in the 1980s. The economic circumstances have been outlined by the Court of Appeals for the Tenth Circuit: In the 1970s and 1980s, the court explained, "federal regulatory price ceilings on natural gas sold in the interstate market had resulted in decreased production and availability of natural gas." *Harvey E. Yates Co. v. Powell,* 98 F.3d 1222, 1227 (10th Cir. 1996). As a result, "[p]ipeline companies . . . were willing to enter into long-term contracts with substantial take-or-pay obligations in order to ensure a steady supply of gas for their customers." *Id.* " '[T]ake-or-pay' clauses . . . obligated the pipeline purchasers either to take a certain minimum amount of gas each year or, failing to do so, to pay [the gas producers] the difference in value between the minimum contract amount and the amount actually taken." *Id.* After deregulation of the natural gas market in the mid–1980s, "the supply of natural gas increased and the market price dropped sharply. Pipeline companies, however, continued to be obligated under their existing take-or-pay contracts to purchase large quantities of natural gas at an above-market contract price." *Id.* In these circumstances, pipeline companies would unilaterally reduce their "takes" without making any additional take-or-pay payments to the producers and producers would bring breach of contract suits against the pipeline companies. *See id.* These cases were resolved primarily through settlements between the parties. *Indep. Petroleum Ass'n of Am. v. Babbitt,* 92 F.3d 1248, 1251 (D.C.Cir.1996) (*IPAA*). However, disputes later arose regarding whether these settlement payments were royalty-bearing under federal law.

The touchstone for deciding whether a settlement payment is royalty-bearing is wheth-

er there is a "link," *IPAA*, 92 F.3d at 1259, or "nexus," *In re Century Offshore Mgmt. Corp.*, 111 F.3d 443, 449–50 (6th Cir.1997) (*Century*), between the payment and production of gas. In determining whether royalties are due on settlement payments, "courts should look, *ex post*, at whether certain actions create a nexus with production." *Century*, 111 F.3d at 450. This is because, under the relevant statutes, royalties are defined as, for example, "any payment based on the value or volume of *production*." 30 U.S.C. § 1702(14) (Jt.App. at A–12) (emphasis added); *see also IPAA*, 92 F.3d at 1253 (stating that royalties are not always due on take-or-pay payments because "the controlling statutes contemplate[ ] royalty payments on the value of the *'production'* of gas" (citing *Diamond Shamrock Exploration Co. v. Hodel*, 853 F.2d 1159, 1168 (1988 ))). As discussed below, courts have generally found no nexus in the "buy-out" situation, but have found a nexus to exist in the "buy-down" and "advance payment" contexts.

In a buy-out case, the D.C. Circuit held that take-or-pay settlement payments are not subject to royalties "until those payments are specifically allocated to gas that is physically severed from the ground." *IPAA*, 92 F.3d at 1258–59. In *IPAA* a gas company paid a gas producer a nonrecoupable lump sum in exchange for the settlement of accrued take-or-pay liabilities and for the termination of a long-term gas sales contract that contained both take-or-pay and make-up provisions. *Id.* at 1250, 1254.[9] On the same day that the parties entered into a settlement agreement, the producer contracted to sell to a third party the gas that was the subject of the original agreement. *Id.* at 1254. By the end of the original contract term, the producer had sold to other purchasers all of the gas which would have been sold to the gas company under the original contract. *Id.* In this situation, the court found the link between the settlement payment and production to be missing because the gas was sold to a substitute purchaser and, therefore, none of the settlement payment was allocable to the price of gas to be subsequently delivered to the gas company party to the settlement. *Id.* at 1259–60.

On the other hand, the necessary link between a lump sum payment and production can exist in either the buy-down or the advance payment situation. In a buy-down, "a settlement payment . . . to the producer . . . accompanies renegotiation of other terms in the supply contract, such as 'a reduced price term, an extension of the delivery terms, a reduction in the minimum or total quantity to be purchased, or some combination of these elements.' " *Yates*, 98 F.3d at 1227 n. 2 (citation omitted).

> Where a purchaser has paid a settlement amount for the purpose of reducing the price of gas taken in the future [a buy-down payment], when that future gas is produced and sold to that purchaser at the reduced price[,] the portion of the settlement attributable to obtaining the reduced price becomes royalty bearing. The fact that a purchaser receives a reduced price on gas the purchaser previously contracted to take at a higher price constitutes a nexus with production.

*Chevron*, 254 F.Supp.2d at 115. Thus, the portion of a settlement attributable to a buy-down arrangement is royalty-bearing when the future production occurs.

In *Chevron*, the producer "entered into numerous settlement agreements with purchasers to amend or replace take-or-pay contracts. A portion of each settlement payment at issue was attributable to the buydown of the contract price for gas." 254 F.Supp.2d at 110. The purchasers continued to take gas from Chevron after the settlements occurred. *Id.* MMS ordered Chevron "to pay royalty on the total of the reduced price purchaser paid for the gas *and* the price purchaser paid to receive that reduced price on that gas." *Id.* at 111. The *Chevron* court found that, in making this assessment of royalties, MMS "complied with the nexus-with-production requirement" because "[t]he royalty assessments [were] (1) limited to gas sold to the original purchaser, (2) limited to the units of gas that were the subject of the original contract and were ultimately sold to the orig-

---

**9.** A make-up clause allows the gas company to "credit take-or-pay payments against 'excess' or make-up gas (gas taken over and above the contract requirements)." *IPAA*, 92 F.3d at 1254.

inal purchaser, and (3) limited to the time period of the original contract." *Id.* at 113. The additional fact that, after the settlement payment, the purchasers did not pay the full contract price for gas led the court to infer that the payments were credited against future production. *Id.* at 114.[10]

In another buy-down case, the U.S. Department of the Interior Board of Land Appeals (IBLA) characterized a lump sum payment paid in settlement of a take-or-pay dispute as a royalty-bearing buy-down payment. *W. Oil & Minerals, Ltd.*, 148 I.B.L.A. 10, 18 (1999). In this case, the producer received a lump sum payment in return for the purchaser's buying a minimum amount of gas at a reduced price during the term of the original gas purchase agreement. *Id.* at 13. After reviewing the relevant case law, the IBLA found the necessary link between the lump sum settlement payment and the gas produced. *Id.* at 16–18.

The necessary nexus between a lump sum settlement payment and production may also exist in the "advance payment" situation. *Century*, 111 F.3d at 449–50. In *Century*, while the parties characterized the lump sum payment as either a "buy down" or a "buy out," the court determined that the payment was an "advanced payment under a substituted requirements contract." *Id.* at 449. *Cen-*

*tury* involved contracts with nonrecoupable take-or-pay clauses[11] for the production of gas on the outer continental shelf. *Id.* at 445–46. In 1992, the purchaser agreed to make a lump sum payment to the producer, "in return for which [the purchaser] was relieved of its obligation to make further payments under the base contracts." *Id.* at 447. Unlike the cases so far discussed, the purchaser and producer were not settling pending litigation and there were no past due take-or-pay liabilities when they entered into the agreement that was the subject of the *Century* case. *Id.* At the same time as this payment and agreement occurred, the parties entered into new, "replacement" contracts. *Id.* These contracts did not have any minimum quantities or take-or-pay clauses. *Id.* The parties stated that, in entering into the new contracts, they "desire[d] to replace and supercede" the previous contracts. *Id.*

Despite the fact that the parties had entered into two separate contracts, the termination contracts and the replacement contracts, the court found that there was only one transaction between the parties. *Id.* at 448. The facts that "the lump sum payment contemplated and was the cause of new gas sales to be delivered in the future, ... the parties intended a continuing relationship, and ... much of the gas identified in the original contracts was delivered under the

---

**10.** In an earlier buy-down case, the Tenth Circuit reached the same conclusion as the *Chevron* court regarding buy-down arrangements. *Yates*, 98 F.3d at 1231. Although the Tenth Circuit decided *Yates* under New Mexico law, it is applicable to the present case (and other cases decided under federal laws and regulations) because under New Mexico law, as under federal law, royalties are due only on gas that is produced. *See id.* at 1230 ("Production is the key to royalty[.]"). The court concluded that the part of a settlement attributable to future price reductions is royalty-bearing "when the future production under the purchase contract is taken at the newly 'bought-down' price." *Id.* at 1236. At the time of production, the royalty is calculated based on both "(1) the proceeds obtained by the lessee from the sale of gas at the bought-down price; and (2) a commensurate portion of the settlement proceeds that is attributable to price reductions applicable to future production under the renegotiated gas sales agreement as production occurs." *Id.* The appellate court remanded the case to the district court to determine the circumstances and character of the settlement payment because the record was not fully developed

regarding the intended allocation of the settlement. *Id.* at 1236–37.

One year after the Tenth Circuit decided *Yates*, it expanded its buy-down payment analysis and stated that

a lessor's royalty interest is not limited to settlements involving an actual "buy-down," as in *Yates*, but extends to any settlement in which a producer receives consideration for compromising its pricing claim, assuming of course that the pricing claim relates to either past or future production actually taken by the settling purchaser.

*Watts v. Atl. Richfield Co.*, 115 F.3d 785, 793 (10th Cir.1997).

**11.** Unlike standard take-or-pay provisions, a nonrecoupable take-or-pay provision provides that if a purchaser "were to make a payment for gas not taken one month, and then take more gas than the minimum purchase quantity the next month, the excess gas would not entitle [the purchaser] to a refund of a portion of the previous month's payment." *Century*, 111 F.3d at 446.

replacement contracts" provided the necessary nexus between the lump sum payment in the termination contracts and the price for production in the replacement contracts. *Id.* at 449.[12] The court found that royalty payments were due on the gas produced, "not merely on the price [the purchaser] ultimately paid, but on that price plus the amount of the lump sum payment allocable to the gas ultimately taken." *Id.* at 450. While the buy-down and advance payment cases demonstrate that there are situations in which the necessary nexus between a lump sum payment and production may exist, facts linking the payment to later production and taking of gas must be present in order for royalties to be due.

Ultimately, "[w]hether or not a lump-sum settlement payment is ... royalty bearing is a question of fact that depends upon the particulars of the individual transaction; namely, whether or not some part of the payment is credited toward gas taken from the ground." *Shell Offshore, Inc. v. Dep't of the Interior,* 997 F.Supp. 23, 29 (D.D.C.1998). The federal district court in *Shell Offshore* provided a nonexclusive list of factors to use to determine whether settlement payments are royalty-bearing. *Id.* These factors include:

> to whom was the gas subject to the settlement ultimately sold; the quantity of the gas ultimately sold to the subsequent purchaser; the date(s) of delivery of the gas identified in the settled contract; [and] the price per unit of the gas ultimately sold, and how that price compares with the open market price of gas at the time of the sale (or, more specifically to what extent the settlement payment appears to be part payment for gas actually delivered).

*Id.* These factors, as well as those discussed above[13] set out an overall structure within which the court analyzes the facts of this case. The court notes that each case discussed above is in some respects distinguishable on its facts from this case, and none requires a finding that there was a breach in this case. The single most important fact in this case is that there may have been a significant amount owed to Arco under pre-existing contracts when the settlement was made. *See* Pls.' Take–or–Pay Supp.App. at 325 (showing that one claim in the underlying litigation that led to the settlement and amended agreements was that MDU/WBI failed to "take and pay for minimum quantities of gas"). Therefore, the economics of this case may differ from the cases in which royalties were found to be due.

Because this court must "resolve all doubt over factual issues in favor of the party opposing summary judgment," *Litton Indus. Prods.,* 755 F.2d at 163, this court must deny

---

12. In contrast, where separate contracts are executed years apart and the explicit purpose of the second contract is for non-production, there is not one transaction and the necessary nexus between the lump sum payment and production does not exist. *Black Butte Coal Co. v. United States,* 38 F.Supp.2d 963, 974 (D.Wyo.1999). In *Black Butte,* a power company contracted to purchase large amounts of coal from a producer. *Id.* at 965. Several years later, the parties entered into deferral agreements. *Id.* at 965–66. The power company paid the producer deferral payments for "idle mine capacity," but still remained obligated under the original contracts. *Id.* Even though no coal was actually delivered under the original contract, the coal producer still received over $13 million in deferral payments. *Id.* at 966. The court distinguished *Century* and held that royalty payments were not due on the deferral payments because there was no link between the lump sum payment and production. *Id.* at 974.

13. The factors previously discussed are as follows: whether a continuing relationship between the parties existed, *Century,* 111 F.3d at 449; *see also Chevron,* 254 F.Supp.2d at 110, 113 (stating that the purchasers continued to take gas from the producer after the settlement and that the royalty assessment on the settlement was proper because, among other reasons, it was "limited to the gas sold to the original purchaser"); whether a renegotiation of the terms of the original contract accompanied the settlement payment, *see, e.g., Chevron,* 254 F.Supp.2d at 114 (using the fact that the price for gas was lower in the settlement agreement than the original contract to infer that the settlement payment was credited toward future production); whether the gas identified in the original contract was subsequently delivered to the original purchaser after the settlement, *Century,* 111 F.3d at 449–50; *Chevron,* 254 F.Supp.2d at 113; and the term of the original gas purchase contract, *see Chevron,* 254 F.Supp.2d at 113 (affirming that MMS was correct in limiting royalties assessed on the buy-down portion of a settlement payment to the gas that was produced during the time period of the original contract).

defendant's summary judgment motion on the take-or-pay issue because there are facts sufficient to support a conclusion that there is a connection between the Arco settlement payment and later production of gas. Arco received a settlement payment from MDU accompanied by a renegotiation of terms in the gas supply contract. *Compare* Pls.' Take–or–Pay Supp.App. at 286–88 (Sept. 10, 1982, Amendment to Gas Purchase Contract), *with id.* at 327–33 (Oct. 17, 1989, Amendment Agreement), *and* Pls.' Take–or–Pay App. at 10–85 (Oct. 17, 1989, Compromise Settlement Agreement). The Compromise Settlement Agreement and the Amendment Agreement were entered into on the same day. *See* Pls.' Take–or–Pay App. at 10 (Compromise Settlement Agreement dated Oct. 17, 1989); Pls.' Take–or–Pay Supp.App. at 327 (Amendment Agreement dated Oct. 17, 1989). The Amendment Agreement contemplated a continuing relationship between the parties. *See* Pls.' Take–or–Pay Supp.App. at 295 (containing portions of the deposition of Ronald D. Tipton, a participant in the settlement negotiations, who, referring to the Amendment Agreement, stated, "This agreement was to cover the volumes to be purchased and the price to be paid for those volumes on a go-forward basis."); *id.* at 327–33 (Oct. 17, 1989 Amendment Agreement). In this renegotiated relationship, there was a reduction in the volume of gas to be purchased. *Compare id.* at 286 (26 million Mmcfd), *with id.* at 327 (8.3 Mmcfd). Also, evidence exists that gas identified in the Amendment Agreement was, in fact, delivered to WBI. *See id.* at 304 (stating that gas was purchased from Arco pursuant to the Amendment Agreement); *id.* at 441–82 (reproducing records of gas purchases by WBI from the Riverton Dome area from Nov. 1989 to Nov. 1991). This evidence, together with all inferences from it favorable to the plaintiff, *see H.F. Allen Orchards,* 749 F.2d at 1574 (stating that the nonmoving party receives the benefit of all inferences), indicate that a nexus exists between the Arco settlement payment and subsequent production and delivery of gas to MDU. One significant issue affecting plaintiffs' case is whether some of the settlement payment should be attributed to accrued take-or-pay liabilities. It may appear at trial that the allocation made by Arco to take-or-pay liabilities was properly reflective of such liabilities and, therefore, the government's failure to challenge the allocation did not constitute a breach of its fiduciary duty. The court cannot find now, however, that as a matter of law a breach did not occur.[14]

Nor can the court find, as defendant argues, that plaintiffs have failed to prove damages here. *See* Def.'s Take–or–Pay Mot. at 15 (stating that plaintiffs cannot show that the allocation of the Arco settlement was mathematically or economically unreasonable). Plaintiffs contend that the settlement amount "should be construed as an advance payment for gas production and it should be divided by ... approximately 36 months." Tr. at 21. This is the amount, plaintiffs argue, upon which monthly royalties should have been calculated for plaintiffs. *Id.* at 21–22. Plaintiffs' basic contention is that, but for the government's lack of diligence in investigating the allocation of the settlement made by Arco, plaintiffs would have received this amount when it was due. *See* Pls.' Take–or–Pay Supp. at 23 ("[H]ad the Government performed any sort of investigation as to whether the allocation [of the Arco settlement] was proper, it would have concluded that the allocation was not supported by the parties' agreement."). Defendant maintains that because plaintiffs took on audit responsibilities, the government could not have caused the damages alleged. *See* Def.'s Take–or–Pay Mot. at 16 ("If the allocation of the proceeds of the settlement were incorrect, this failure to identify and address this failure was the Tribes. They assumed the audit responsibility and should have ascertained any accounting error. If there was an error, it was not an act of the United States[.]").

At oral argument plaintiffs illustrated how they believe damages can be proven in this case. Tr. at 21–22. Plaintiffs' model was supported by documentary evidence provided

---

14. While the court acknowledges the government's current predicament of defending causation some fourteen years after the settlement was entered into, the court does not believe that circumstance warrants a finding of summary judgment against plaintiffs.

to the court in earlier briefing. *See* Tr. at 17–19 (citing Pls.' Take–or–Pay Supp.App. at 300, 325 (Arco complaint), 440 (settlement proposal showing lump-sum payment as first item), 441 (showing that gas was purchased under the new contract)). The court finds that plaintiffs have made a sufficient showing as to causation and damages to overcome summary judgment at this time. *See Celotex*, 477 U.S. at 323, 106 S.Ct. 2548; *Litton Indus. Prods.*, 755 F.2d at 163.

## C. MMS Claim

The MMS dispute must also be resolved within the framework set out in *Navajo Nation*, 537 U.S. 488, 123 S.Ct. 1079. Plaintiffs must identify a substantive source of law that establishes fiduciary duties that the government must fulfill and present evidence that this law is money mandating. *Id.* at 506, 123 S.Ct. 1079. Plaintiffs must then state how the government breached those duties. *See id.* (stating that, in order to state a claim, a plaintiff must allege that the government has "failed faithfully to perform [fiduciary] duties").

### 1. Fiduciary Duties

#### a. Performance of Major Portion Analysis

█ As to its allegation that defendant did not use major portion analysis in determining the proper value on which royalties were due, plaintiffs point to 30 C.F.R. § 221.110 (1982) (Jt.App. at C–10) to support its contention

regarding royalties due prior to 1988. Tr. at 56. This regulation states that "[i]n the absence of good reason to the contrary, value computed on the basis of the highest price . . . paid or offered at the time of production in a fair and open market for the major portion of like-quality oil, gas, or other products produced and sold from the field or area where the leased lands are situated will be considered to be a reasonable value." 30 C.F.R. § 221.110 (1982) (Jt.App. at C–10).

For royalties due from 1988 onward, plaintiffs point to 30 C.F.R. § 206.102 (Jt.App. at D–13), Tr. at 54–55, which states:

> For any Indian leases which provide that the Secretary may consider the highest price paid or offered for a major portion of production (major portion) in determining value for royalty purposes, if data are available to compute a major portion, MMS will, where practicable, compare the value determined in accordance with this section with the major portion. The value to be used in determining the value of production, for royalty purposes, shall be the higher of those two values.

30 C.F.R. § 206.102(a)(2)(i) (1988); 30 C.F.R. § 206.52(a)(2)(i) (1996) (Jt.App. at D–13). However, for transactions that did not occur at arm's length,[15] the regulations mandate that value be determined according to a series of benchmarks. Pls.' MMS Supp. at 4 (citing 30 C.F.R. § 206.102 (1988); 30 C.F.R. § 206.52 (1996) (Jt.App. at D–13 to D–18)).[16]

---

**15.** Plaintiffs allege that the transactions upon which they are claiming royalties did not occur at arm's length because the lessee and pipeline owner who actually purchased the oil were controlled by the same entity. *See* Pls.' MMS Supp. at 4. However, the facts upon which the conclusion that the transaction did not occur at arm's length are based are contained in an expert report that defendant has moved to strike. *See* Memorandum in Support of United States' Motion to Strike Certain Exhibits to the Tribes' Supplemental Response to the Government's Motion for Summary Judgment, or, in the Alternative, for Further Discovery (Def.'s Strike Mot.) at 1–2 (moving to strike exhibit E, Mr. Reineke's expert report, in the Appendix to Tribes' Supplemental Response to the Government's Motion for Summary Judgment as to Various Claimed Breaches in MMS Royalty Payment Processing). At this point, it is not necessary for the court to determine whether the transactions were arm's

length or not and the court does not rely on any information referred to by plaintiff on this point in reaching its decision. For the court's ruling on defendant's motion to strike, see note 18 below.

**16.** These benchmarks state:
> The value of oil production from leases subject to this section which is not sold under an arm's-length contract shall be the reasonable value determined in accordance with the first applicable of the following paragraphs:
> (1) The lessee's contemporaneous posted prices or oil sales contract prices used in arm's-length transactions for purchases or sales of significant quantities of like-quality oil in the same field (or, if necessary to obtain a reasonable sample, from the same area); provided, however, that those posted prices or oil sales contract prices are comparable to other contemporaneous posted prices or oil sales

Defendant argues that there is no breachable duty here because, under FOGRMA, the Cooperative Agreement governs the relationship between the parties. *See* Tr. at 84 ("[T]he [C]ooperative [A]greement defines the parties['] obligations."); *id.* at 85–88 (citing 30 U.S.C. §§ 1701(b)(5), 1732, 1753(b)). As noted above, in section II.B.2., the court does not believe the Cooperative Agreement governs defendant's duties. While the regulations do offer some discretion to the Secretary regarding whether to conduct major portion analysis, the regulations provide that "where practicable," the Secretary *"will"* conduct major portion analysis. 30 C.F.R. § 206.102(a)(2)(i) (1988); 30 C.F.R. § 206.52(a)(2)(i) (1996) (Jt.App. at D–13) (emphasis added); *see also Shoshone*, 56 Fed.Cl. at 649 (analyzing Secretary's responsibilities under 30 C.F.R. § 206.102(a)(2)(i) (1988)). This court has already determined that the regulations at issue are part of a "comprehensive valuation framework [that] creates fiduciary responsibilities on the part of the government." *Shoshone*, 56 Fed.Cl. at 648. These regulations satisfy the *Navajo Nation* standard and "establish[ ] specific fiduciary or other duties," *Navajo Nation*, 537 U.S. at 506, 123 S.Ct. 1079, for the Secretary with respect to the oil and gas leases.

### b. Determination of Transportation Allowances

■ Plaintiffs next argue that the government did not adequately determine permissible transportation allowances under the oil and gas leases. Tr. at 59–60, 72. Plaintiffs point out that under the applicable regulations, in calculating the value of gas for royalty purposes, transportation costs are deducted from the value. Tr. at 60 (citing 30 C.F.R. § 206.156(a) (1988); 30 C.F.R. § 206.176(a) (1996) (Jt.App. at D–52)). Next, plaintiffs cite 30 C.F.R. § 206.157(a)(1)(ii)-(iii) (1988) and 30 C.F.R. § 206.177(a)(1)(ii)-(iii) (1996) (Jt.App. at D–54), which show how MMS is to determine if the deduction is proper, and what to do if it is not. Tr. at 60.

The court finds that these regulations establish a duty on the part of the Secretary for the period from 1988 forward. The regulations impose on MMS the duty to allow transportation deductions where allowable, *see* 30 C.F.R. § 206.156(a) (1988); 30 C.F.R. § 206.176(a) (1996) (Jt.App. at D–52) ("MMS shall allow a deduction for the reasonable actual costs incurred by the lessee to transport unprocessed gas, residue gas, and gas plant products from a lease to a point off the lease."), and provide guidelines for MMS to follow, 30 C.F.R. § 206.157(a)(1)(ii)-(iii) (1988); 30 C.F.R. § 206.177(a)(1)(ii)-(iii) (1996) (Jt.App. at D–54). This regulatory language creates money mandating obligations for the government because MMS's duties go "beyond the 'bare' or minimal level, and thus could 'fairly be interpreted as mandating compensation' through money damages if the Government faltered in its responsibility."[17] *White Mountain Apache,*

contract prices used in arm's-length transactions for purchases or sales of significant quantities of like-quality off in the same field (or, if necessary to obtain a reasonable sample, from the same area). In evaluating the comparability of posted prices or oil sales contract prices, the following factors shall be considered: Price, duration, market or markets served, terms, quality of oil, volume, and other factors as may be appropriate to reflect the value of oil. If the lessee makes arm's-length purchases or sales at different postings or prices, then the volume-weighted average price for the purchases or sales for the production month will be used;

(2) The arithmetic average of contemporaneous posted prices used in arm's-length transactions by persons other than the lessee for purchases or sales of significant quantities of like-quality oil in the same field (or, if necessary to obtain a reasonable sample, from the same area);

(3) The arithmetic average of other contemporaneous arm's-length contract prices for purchases or sales of significant quantities of like-quality oil in the same area or nearby areas;

(4) Prices received for arm's-length spot sales of significant quantities of like-quality oil from the same field (or, if necessary to obtain a reasonable sample, from the same area), and other relevant matters, including information submitted by the lessee concerning circumstances unique to a particular lease operation or the salability of certain types of oil;

(5) A net-back method or any other reasonable method to determine value[.]

30 C.F.R. § 206.52(c) (1996) (Jt.App. at D–15 to D–16); *see also* 30 C.F.R. § 206.102(c) (1988) (Jt.App. at D–15 to D–16) (stating same benchmarks, with a few minor language variants).

17. The Tribes have conceded that they "will not make any claims at trial relating to transporta-

537 U.S. at 474, 123 S.Ct. 1126 (citation omitted).

### c. Collection of Late Payment Interest

■ Plaintiffs' third MMS claim involves the government's failure to collect late payment interest. Tr. at 78. Plaintiffs argue that this duty is based on the fact that the United States, not the Tribes, was responsible for the timeliness of royalty payments under the Cooperative Agreement. Response of the Defendant to Plaintiff[s'] Proposed Findings of Fact in Support of their Supplemental Response to the Government's Motion for Summary Judgment on the Issue of MMS Royalty Payment Processing (Def.'s MMS PFUF Resp.) ¶ 19. In supplemental briefing, plaintiff divided its argument into two parts: the 1981 to 2000 time period and the 1973 to 1981 time period. Tribes' Supplemental Brief Addressing Transportation Allowances and Late Payment Interest (Pls.' Supp.) *passim.*

With respect to the 1981 to 2000 time period, plaintiffs rely on 30 U.S.C. § 1721(a), Pls' Supp. at 2, which states, with respect to a charge on late payment or royalty interest:

> In the case of oil and gas leases where royalty payments are not received by the Secretary on the date that such payments are due, or are less than the amount due, the Secretary shall charge interest on such

late payments or underpayments at the rate applicable under section 6621 of Title 26.

30 U.S.C. § 1721(a) (Jt.App. at A–15).[18] The government has conceded that "the United States first had regulatory authority to collect interest on late payments due on royalties beginning [on] February 1, 1981." Defendant's Brief Addressing the Statutory and Regulatory Bases of Alleged Duties of the United States (Def.'s Supp.) at 3. The court finds that the cited language creates money mandating duties for the period beginning February 1, 1981.

■ Defendant disagrees with plaintiffs, however, that there was a duty to collect late payment interest prior to 1981. *Id.* Plaintiffs rely on a series of decisions of the Department of Interior Board of Land Appeals (IBLA) to support their contention that there was a duty here. Pls.' Supp. at 3–4. *Navajo Nation* states, however, that the "analysis must train on specific rights-creating or duty-imposing statutory or regulatory prescriptions." *Navajo Nation,* 537 U.S. at 506, 123 S.Ct. 1079. IBLA decisions, by themselves, cannot create a money mandating obligation absent a statutory or regulatory basis. As a regulatory basis, plaintiffs cite the Federal Claims Collections Standards, 4 C.F.R. § 102.10 (1966); 4 C.F.R. § 102.11 (1979) (Jt.App. at E–1), which, they argue "required [the United States Geological Sur-

---

tion allowances for the pre–1988 time period." Tribes' Supplemental Brief Addressing Transportation Allowances and Late Payment Interest (Pls.' Supp.) at 1–2.

18. At oral argument, plaintiffs relied extensively on expert reports in support of this argument. *See* Tr. at 78–81. In addition to its motions for summary judgment, defendant has also moved to strike the expert reports attached as exhibits to the Tribes' Supplemental Response to the Government's Motion for Summary Judgment as to Various Claimed Breaches in MMS Royalty Payment Processing pursuant to RCFC Rule 12(e). Def.'s Strike Mot. at 1. Defendant also asks for certain additional exhibits to be stricken, Def.'s Strike Mot. at 1–2, but, as those exhibits have not been used by the court in reaching its decision, the court finds these portions of the motion MOOT.

Defendant's argument centers on the affidavits preceding the expert reports attached to plaintiffs' supplemental brief. Defendant argues that the reports are deficient under RCFC 56(e);

[N]one of the affidavits contains even the most basic of information required by Rule 56(e)[:] that the affiant has personal knowledge of the facts being asserted, that the affiant is competent to testify to the facts asserted in the plaintiffs' response, and, most importantly, the actual *facts* that are being relied upon by the plaintiffs.

Def.'s Strike Mot. at 5 (emphasis in original). The court finds this argument well founded. Defendant's motion is GRANTED as to the expert reports attached to plaintiff's supplemental brief. But the court finds that plaintiffs' proposed findings of fact, otherwise supported, taken together with all reasonable inferences favorable to plaintiffs, *see H.F. Allen Orchards,* 749 F.2d at 1574 (providing that in a motion for summary judgment, all favorable inferences go to the nonmoving party), are sufficient to support plaintiffs' claims at this juncture. If plaintiffs intend to support or oppose future dispositive motions based on the expert reports, plaintiffs must cure these deficiencies under Rule 56(e).

vey] to collect interest on late royalty payments during the pre–1981 time period." Pls.' Supp. at 4. But, as defendant notes, "The regulations explicitly state that they apply only to claims by the United States." Def.'s Supp. at 3.[19] The court agrees with defendant that the regulatory language cited by plaintiffs applies only to civil suits, not to the administrative collection of interest. The court finds no duty to collect late payment interest prior to February 1, 1981.

### 2. Breach

█ Breach as to the MMS issues is, in effect, acknowledged by defendant's responses to plaintiffs' proposed findings of fact. The government agrees that major portion analysis was not performed to value the Tribes' oil for royalty purposes during the 1980s and 1990s. Def.'s MMS PFUF Resp. ¶ 2. Defendant also agrees that "a formal full-blown transportation audit" has not been performed. *Id.* ¶ 12. Finally, as noted above, defendant agrees that it was responsible for the collection of late payment interest beginning in 1988. *See id.* ¶ 19 ("The United States agrees that the United States, not the Tribes, addressed the timeliness of payments."). The court has found that the government had, in the circumstances and in accordance with the standards set out in the statute and regulations, a duty to perform major portion analysis, review transportation allowances and collect late payment interest. Defendant has effectively conceded that a breach of these duties may have occurred.

Plaintiffs rely on expert reports to prove their damages in this case. As noted at footnote 18, the court does not believe these reports have been appropriately presented under Rule 56(e) and therefore are not admitted as evidence in support of the Tribes' opposition to defendant's summary judgment motions.[20] However, the burden here is on defendants to show that summary judgment

is warranted. *See Celotex,* 477 U.S. at 323, 106 S.Ct. 2548 ("[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion."). Defendant must show that there is not a genuine issue of material fact. *Id.* at 322, 106 S.Ct. 2548. Additionally, the nonmoving party "receive[s] the benefit of all applicable presumptions, inferences, and intendments." *H.F. Allen Orchards,* 749 F.2d at 1574. Defendant's argument as to damages is that, "in light of the Cooperative Agreement, the Tribes are unable to prove that any breach by the government *caused* their alleged damages." Defendant's Reply to Tribes' Supplemental Response to Government's Motion for Summary Judgment as to Various Claimed Breaches in MMS Royalty Payment Processing at 10 (emphasis in original). Defendant contends that, since the Cooperative Agreement shifted the audit function from the government to the Tribes, "the Tribes are unable to show that any action (or inaction) by the government, rather than by themselves, effectively caused the Tribes to receive less in royalties for oil and gas." *Id.* at 10–11. The court has decided that the Cooperative Agreement does not reduce the government's fiduciary responsibilities, *see supra* Part II.B.2; it does not shift to the Tribes the government's duty to perform major portion analysis, review transportation allowances and collect late payment interest. Any loss to plaintiffs resulting from defendant's failure to perform these duties was caused by the defendant. Where, as here, there is evidence of a breach, it is reasonable to infer that some damages flow from that breach. *See Confederated Tribes of the Warm Springs Reservation v. United States,* 248 F.3d 1365, 1373 (Fed.Cir.2001) ("[I]f a trustee fails to keep proper accounts, 'all doubts will be resolved against him and not in his favor.'" (quoting William F. Fratcher, *Scott on Trusts* § 172 (4th ed.1987))). Summary judgment is not warranted at this time.

**19.** "The regulations in this chapter ... *prescribe standards for the administrative collection,* compromise, termination of agency collection action, and the referral to the General Accounting Office, and to the Department of Justice for litigation, *of civil claims* by the Federal Government for money or property." 4 C.F.R. § 101.1 (1979) (emphasis added).

**20.** Once expert discovery has been completed, defendant may file a dispositive motion based on the expert reports. At that time plaintiffs may present the expert reports, if done in a manner consistent with the rules of this court.

## III. Conclusion

For the foregoing reasons defendant's Take–or–Pay Motion as to the Arco settlement is DENIED. Defendant's MMS Motion is DENIED except as to transportation allowances prior to 1988 and late payment interest prior to 1981, as to which defendant's MMS Motion is GRANTED.

IT IS SO ORDERED.